Opinion by
 

 Stadteeld, J.,
 

 This is an appeal from thé order of the Court of Common Pleas of Greene County entering judgment non obstante veredicto in favor of defendant.
 

 Plaintiffs sued to recover for services rendered testator and a jury awarded a verdict for $2400-
 

 The plaintiff, Mary Tustin, a niece of decedent, was orphaned at the age of ten years, and for twenty-five years thereafter lived as a member of testator’s family until her marriage on September 22, 1920. Plaintiffs, after their marriage, maintained a separate home until they went to Florida in 1927, when they gave up their home and stored their furniture in Mr. Grimes’ barn. Decedent maintained and educated his niece at his own expense, although she had an estate of her own. Decedent was never married.
 

 
 *524
 
 Plaintiffs’ statement of claim avers that shortly after their marriage, testator requested them to come to his home and assist in caring for him and his property, and that in compliance with his request, plaintiffs took up their residence with testator and served him some seven months, after which plaintiffs lived apart from testator until the spring of the year 1928, when they resumed their residence with testator and continued to serve him until the latter’s death on November 5, 1931, at the age of eighty-five years.
 

 Plaintiffs aver that their services were rendered at the request of testator and upon his agreement to pay therefor.
 

 The case was tried before Judge Sayers and a jury. Judge Sayers’ term of office expired between the time of the verdict and the time of the argument of the motion for judgment, whereupon the same was argued before Judge Rowley of Mercer County, specially presiding, who, in an opinion filed, entered judgment non obstante veredicto in favor of defendant.
 

 Mary Tustin performed the duties of housekeeper for the deceased. Alex Tustin performed all the duties that a man of the house would in connection with the garden, lawn, etc., and, in addition, took the decedent to church each Sunday and for numerous other car rides.
 

 The following is a resume of the testimony on behalf of the plaintiffs: Erwin Lippencott who knew the deceased, Caleb Grimes, for over fifty years, testified that he was talking to Mr. Grimes about four years before the latter’s death. Mr. Grimes told him that he did not expect to buy an automobile because, as he stated, “I have got Alex Tustin to take care of me and I expect to pay him well for his labor.” Again Mr. Lippencott was talking to Mr. Grimes and his testimony was as follows: “Well, he was talking and I says to him, I says, I understand Alex is going to go West’, he says, ‘No’, he says ‘Alex is not going West’, he says, ‘I told
 
 *525
 
 him and his woman that’, Alex and Mary is the way he stated it to me, ‘that if they stay with me and do my work I will pay them better and more than they can make going out there.’ ”
 

 This latter conversation took place some time during 1928 or within three years of the death of Mr. Grimes.
 

 Another witness, Harles Taylor, testified that he knew Mr. Grimes fifteen or twenty years; that he knew Alex Tustin for twenty years and Mary Tustin for ten or fifteen years; that Mr. Grimes told him sometime in 1929 that Alex Tustin took him to church every Sunday and that Mr. Grimes said he intended to pay Mr. Tustin for the trouble he had with him in hauling him around.
 

 W. F. Graham testified that he had known Mr. Grimes for over fifty years, that either in 1928 or 1929 he had a conversation with Mr. Grimes about the services of Alex Tustin, a summary of which is as follows, “ ‘Yes, Alex is pretty busy,’ he says, ‘I have quite a bit to attend to,’ he says, ‘he always has hauled me,’ and he says, ‘he will yet,’ and he says, ‘I am going to stay right by him until the last minute,’ and he says, or I says, ‘Well, that’s worth something to Alex all right enough and a whole lot to you. ‘Yes,’ he says, ‘there’s thousands of dollars coming to Alex and he is going to have money sometime.’ ‘Yes,’ he says, ‘I will pay him and I will well pay him but Alex won’t let me pay for it now,’ he says, ‘I have offered to pay for gas a time or two and paid for it once.’ ”
 

 The Reverend Edward O. Sebold was the deceased’s pastor at a church five miles from the residence of the deceased for a period of several years. In 1925 the deceased told Rev. Sebold that he would be compelled to withdraw from the church because his physical condition would not permit him to drive a horse the necessary distance. In March of 1926, shortly before he gave up the pastorate of the church, Mr. Grimes informed him that he had hired Alex permanently be
 
 *526
 
 cause lie had sold Ms horse just recently, to take him wherever he cared to go. In another conversation, about June of 1929, at the home of Mr. Grimes,' the latter told him that he had put Mrs. Tustin in charge of the house and that Mr. Tustin was also there. Rev. Sebold was very much concerned because of Mr. Grimes’ financial standing and tried to find some way for Mr. Grimes to continue his attendance. He had Mr. Grimes and Alex Tustin to dinner one evening and Mr. Grimes agreed that if Alex would haul him to church he would pay him well. Again in June, 1931, or four months before Mr. Grimes died, Mr. Sebold talked to the deceased about an endowment for the church. At that time, Mr. Grimes told him that he was not leaving any stated definite amount to anybody because of the fact that he had Mr. and Mrs. ¡Tustin yet to pay and that he did not know exactly how much it was, but that it would run into several thousand dollars; that his funds were depleted, etc.
 

 Dr. J. H. Hazlett, a physician, who attended Mr. Grimes professionally at intervals • during the last two years of his life, testified that he was in the latter’s home twenty or thirty times between the first of September, 1930 and the date of his death on Nov. 5, 1931, that on these occasions, he saw Mrs. Tustin managing the house as general housekeeper. Mrs. Jacob Yeager, wife of Jacob Yeager, county commissioner, testified to the same effect.
 

 Joe Thomas testified that he rented a house to Alex Tustin on North Maiden St., Waynesburg, shortly after September 1, 1920; that the latter furnished it and got ready to move in but did not move in until the following spring, because he and his wife went over to take care of Mr. Grimes, although they paid rent during these six or seven months for their own home.
 

 Snowden White, who lived across the street from the
 
 *527
 
 home of Mr. Grimes for fourteen years from 1919, testified that the latter was not in good health a good bit of the time; that Alex Tustin and his wife were the manager and housekeeper of the home during four years of that period; that he saw Alex Tustin work in the garden a good many times and mowing the lawn, and doing some painting and different things; that he saw Mr. Grimes traveling in Alex Tustin’s automobile many times; that he never saw Mr. Grimes doing very much work around his place after Mr. Tustin got there; that Mr. Tustin seemed to do the most of the work. T. H. Shannon, attorney-at-law at Waynesburg, testified to like effect.
 

 Dr. Charles W. Spragg, who lived two doors away from Mr. Grimes since 1919 and who attended the latter a half-dozen times about 1930 or 1931, testified that during these visits he saw Mrs. Tustin taking care of him; he saw no one there but Mr. and. Mrs. Tustin.
 

 Mrs. Lynn Buchanan, who lived two houses, or about 130 feet away from the home of Mr. Grimes for nine years from 1924, when she became acquainted with the latter, testified that she visited there about every two weeks, and saw Mrs. Tustin in charge of the housekeeping, cooking the meals and doing all the baking and sweeping; that this continued until Mr. Grimes’ death; that during this time, Mr. Tustin cared for the property outside the house. “He made all the garden, dug the potatoes, buried them, attended to the horse, dug up sewer pipe, painted the barn, chicken house, roofed the barn and chicken house, painted the roofs, mowed the lawn, kept the shrubbery trimmed, scrubbed the porches, he did everything that was to be done outside that I saw, emptied the ashes, cleaned the furnace, took Mr. Grimes in his car all the time, hundreds of times I would say, hauled chicken feed in his car,' took Mr. Grimes to church, for rides on Sunday afternoon.” She estimated Mrs. Tustin’s services were worth $75 per
 
 *528
 
 month; that she never saw Mr. Grimes or Jane Thompson, his former housekeeper, doing any work in the home.
 

 Mrs. Iva McAndrews, who lived 150 or 175 feet from the home of Mr. Grimes, testified substantially to the same effect as did Patrick McAndrews, her husband. Mr. McAndrews estimated Mr. Tustin’s services as being worth $150 a month, based on the cost generally of like services in the neighborhood.
 

 Lynn Buchanan lived 130 or 140 feet from the home of Mr. Grimes since 1924, visited several times at the home of the latter and saw Mrs. Tustin in charge of the home as general housekeeper and manager, and Mr. Tustin took care of the grounds and outside work, and saw him take Mr. Grimes for rides in the automobile hundreds of times; that he estimated the value of his services at $150.00 a month; that he never saw anyone do any work around the house, with the exception of Mr. Tustin.
 

 The rendition of the services specified was not seriously questioned. They are summarized by the court below in an opinion by Rowley, P. J., as follows: “(A). Services in caring for decedent and his property from the fall of 1920 to the spring of 1921, a period of seven months, during which plaintiffs lived with decedent in his home. (B). Oaring for decedent’s horse, chickens, garden and lawn, the home and other chores. These services are alleged to have been rendered by Alex Tustin beginning in the summer of 1921 and continuing until December 1921, during which period plaintiffs lived apart from decedent. (O). In December 1922 Alex Tustin accompanied decedent to Florida, returning in three weeks. (D). From January 1,1922, until March 22, 1926, Alex Tustin continued to assist decedent in earing for his property, garden, yard, horse and other jobs, while living apart from him. (E). From March, 1926 until the autumn of 1927 Alex Tustin con
 
 *529
 
 veyed decedent in the automobile of the former to church at Ruffs Creek and elsewhere, while plaintiffs lived apart from decedent. (F). From the spring of 1928 until November 5, 1931, plaintiffs lived in decedent’s home and cared for the lawn, garden, and general household affairs of decedent, including the care of Jane Thompson, an inmate of that home.”
 

 From the testimony, it may fairly be stated that the family relationship did not exist at the time the services commenced; that plaintiffs came from their own home at the instance of decedent; that the services were rendered at the request of decedent; and that the latter promised to pay therefor; and that he admitted an indebtedness therefor as late as four months before his decease.
 

 The case was submitted to the jury in a fair and comprehensive charge to which only a general exception was taken on behalf of the defendant. The jury found in favor of plaintiffs. The testimony, if believed, warranted the jury in finding that there was a contract to pay, although no definite time was stated when they should be paid; that all the circumstances of the case show an undertaking on the part of the decedent, to employ plaintiffs to live with him in and about his household, in the capacity of employees or assistants as housekeeper, gardener, etc.; that their presence was not there due to the fact that they were merely interested on account of the relationship as a niece and an uncle, but were there on a contractual basis.
 

 The testimony of Sebold that decedent told him that his estate had been depleted and he didn’t know what he had, plaintiffs claim accounts for the failure of decedent to previously have paid them. It is further urged on behalf of plaintiffs that the will of decedent which was offered in evidence, provided for a division of the estate into shares, rather than designating certain amounts, and that this is in accordance with the testi
 
 *530
 
 mony of Sebold to the effect that he was leaving no definite amounts because of his large indebtedness to the Tustins. These matters were all for the consideration of the jury.
 

 We find no denial that the services sued for were rendered and were worth the amount fixed by the verdict.
 

 It is contended however first, that a family relation existed between plaintiffs and decedent which created a presumption that the services were rendered gratuitously, and, second, that if no such family relationship existed, there was a presumption that payment for services was made periodically and that the evidence was insufficient to rebut either of these presumptions.
 

 The mere fact that the plaintiff’s wife was a niece of decedent raises no such presumption of family relationship as would defeat the claim:
 
 Evans Estate,
 
 60 Pa. Superior Ct. 83;
 
 Griffin’s Estate,
 
 96 Pa. Superior Ct., 185;
 
 Gibbs Estate,
 
 266 Pa. 485, 110 A. 236;
 
 Kerr v. Wilson,
 
 284 Pa. 541, 131 A. 468;
 
 Hartman v. Moloney,
 
 128 Pa. Superior Ct. 302, 194 A. 234. To establish such connection as a family relationship, the burden lies on the party who asserts it:
 
 Caskey v. Kineavy,
 
 60 Pa. Superior Ct. 87, 95.
 

 Quoting from the opinion by Mr. Justice Frazer, in
 
 Kerr v. Wilson,
 
 supra, at p. 543: “The mere relationship of nephew and uncle does not in itself create a presumption of gratuitous service
 
 (Gibb’s Estate,
 
 266 Pa. *485), consequently an implied promise existed to pay for the services rendered and accepted, and the burden devolved on the person denying such liability to show that no debt was in fact intended.”
 

 As stated by Mr. Justice Kephart (now Chief Justice) in
 
 Caskey v. Kineavy,
 
 supra: “Like all issues of fact tried by a jury the case is for their consideration, unless the evidence sustaining such relationship be of such character that but one conclusion can be reached
 
 *531
 
 therefrom, that is, that this relationship existed. Each case must to a great extent depend on its own facts.”
 

 In the instant ease, the family relationship had terminated at the time of Mary Tustin’s marriage in 1920 and she and her husband had established a separate home. Mr. Grimes had become ill and his former housekeeper, Jane Thompson, had become aged and no longer in good health or able to render the necessary services. Under these circumstances, according to the testimony, plaintiffs, at the request of decedent entered his household and performed the duties required of them, upon the express promise of decedent to pay therefor.
 

 As stated by Judge James in
 
 Hartman v. Moloney,
 
 supra, at p. 308: “Plaintiffs are not required to show that all the terms were defined:
 
 Miller’s Appeal,
 
 100 Pa. 568, .or that a certain sum was expressly agreed upon. All that was required was for them to show that the gist of the agreement was to pay for services rendered; the reasonable value of the services would determine the amount due:
 
 Perkins v. Harbrouck,
 
 155 Pa. 494, 26 A. 695,
 
 Griffins Estate,
 
 supra.”
 

 The cases cited on behalf of appellee are readily distinguishable from the instant case. In them the family relationship actually existed at all times during which compensation was claimed, or claimants depended on loose declarations or expectations of reward which were not sufficient on which to base a recovery.
 

 While claims against decedents’ estates should be carefully scrutinized, we do not believe that recovery should be denied where they are supported by credible and disinterested testimony.
 

 The evidence was of such a character, both as to the existence of a contract, as also whether the presumption of periodical payments had been overcome, that it was proper to submit to the determination of a jury. This was done in a fair and comprehensive charge and re-
 
 *532
 
 suited in a verdict for plaintiffs. We believe that there is ample evidence to sustain tbe verdict and that the court below erred in entering judgment for defendant non obstante veredicto.
 

 Tbe assignment of error is sustained, tbe judgment is reversed and tbe record is remanded with directions to enter judgment on tbe verdict.